[No. D005358. Fourth Dist., Div. One. July 24, 1987.]

JAMES A. EDMONDS, JR., as Real Estate Commissioner, etc., Plaintiff and Respondent, v.
JOHN J. AUGUSTYN, Defendant and Appellant.

COUNSEL

John K. Van de Kamp, Attorney General, Edmond B. Mamer and Neal J. Gobar, Deputy Attorneys General, for Defendant and Appellant.

Klitgaard & Jones and Robert J. Klitgaard for Plaintiff and Respondent.

OPINION

WORK, J.—John J. Augustyn appeals a declaratory relief judgment limiting recovery from the real estate fund (Fund) established by the Real Estate Education, Research and Recovery Act (Bus. & Prof. Code,[1] § 10470 et seq., the Act) to the individual $100,000 account of real estate broker Wayne Burton and precluding recovery from any of his licensed subagents' accounts pursuant to sections 10471 and 10474. The judgment purports to adjudicate the rights of several victimized investors whose claims are separate from those of Augustyn and apparently unrelated to each other's. However, each of these persons was deemed to have appeared through their counsel, Robert J. Klitgaard. Accordingly, as a matter of equity and fairness, we treat Augustyn's appeal as being representative in nature on behalf of all those victimized investors named in the declaratory relief judgment. For the reasons which follow, we conclude Augustyn's factual and legal challenges to the declaratory relief judgment have merit and reverse the judgment as to him and the other victimized investors.

FACTUAL AND PROCEDURAL BACKGROUND[2]

The pertinent portion of the stipulated record reveals Burton, a licensed real estate broker, began in early 1980 to perpetrate a state-wide Ponzi scheme persuading investors to purchase second trust deeds allegedly secured by equity in California real estate which in fact were either not secured at all or far more risky than had been promised. Burton operated

---

[1] All statutory references are to the Business and Professions Code.

[2] As Augustyn aptly points out, the "nefarious" operations of Burton, a licensed real estate broker who operated under the fictitious names of Universal Financial and California Equities Home Loan, are well known to the Courts of Appeal in California. (See *Augustyn* v. *Superior Court* (1986) 186 Cal.App.3d 1221 [231 Cal.Rptr. 298]; *Kirby* v. *Palos Verdes Escrow Co.* (1986) 183 Cal.App.3d 57 [227 Cal.Rptr 785]; *Montoya* v. *McLeod* (1985) 176 Cal.App.3d 57 [221 Cal.Rptr. 353]; *Leyva* v. *Superior Court* (1985) 164 Cal.App.3d 462 [210 Cal.Rptr. 545]; *Monje* v. *Thompson* (Cal.App.) (May 22, 1987) D005455; *Baglia* v. *Bohannon* (Cal.App.) (May 22, 1987) D005454.)

several real estate offices under the fictitious names of Universal Financial and California Equities Home Loan, among others. He employed approximately 150 individuals as "investment counselors", many of whom were not licensed as required to perform the acts delegated to them by Burton. He advertised and solicited investors representing high rates of interest (18 percent and 22 percent) that would be paid on investments secured by trust deeds on real property which would not exceed 70 percent to 80 percent of the fair market value of the realty. Upon deposit of money, an investor would receive a note providing for payment of interest from date of deposit and advised the invested funds would be held in escrow until funds were used to acquire a note secured by a trust deed of the nature agreed upon and the trust deed was properly assigned to the investor and recorded. Many misrepresentations were made regarding the nature and worth of the underlying securities. Trust funds were converted and fraud and deceit committed. For example, real properties would be grossly over-appraised and notes and trust deeds would be created upon these inflated appraisals substantially exceeding the purchase price and the fair market value of the underlying property. Prepaid interest held in trust was also converted. As a result of these actions, thousands of investors lost millions of dollars.

Burton's "investment counselors" solicited, negotiated and otherwise dealt directly with investors in matters requiring a real estate license; however, approximately one-third of these individuals never held real estate licenses and many of the licensed investment counselors worked for Burton when not licensed to do so. These investment counselors usually worked in branch offices, handling personal contacts with investors, passing information and documents between the main office and San Bernardino and their clients. Their conduct requiring a license normally consisted of providing information furnished by the home office to potential investors; upon receipt of an investment, the filling out of standard forms reflecting details of the investment and providing for a deposit in escrow; the giving of a promissory note and the transmitting of money to the home office; and, following assignment of a trust deed, the forwarding of a copy of the trust deed, note, assignment, appraisal and title insurance to the investor.

A number of the investors obtained judgments against some of Burton's investment counselors based on their personal negligent misrepresentations or other breaches of fiduciary duty while engaging in these actions under color of their own licenses and have sought recovery under section 10471[3]

---

[3] Section 10471, subdivision (a) provides: "When an aggrieved person obtains a final judgment in a court of competent jurisdiction against a defendant based upon the defendant's fraud, misrepresentation, deceit, or conversion of trust funds arising directly out of any transaction in which the defendant, while licensed under this part, performed acts for which that

claiming amounts substantially in excess of $100,000 under section 10474, subdivision (c).[4,5]

The California State Real Estate Commissioner (Commissioner) petitioned under section 10474.5[6] to consolidate all claims against the Fund involving the alleged fraudulent conduct of broker Burton and his licensed agents and to prorate the recoveries of individual claimants only against the Burton Fund. Finding for the Commissioner, the court ruled: "The court decides that under the stipulated facts negligent misrepresentation and breach of fiduciary duty of the investment counselor employees of the real estate broker Wayne Burton in passing information and documents between the broker Burton and investors were integral to and a part of the activities of the broker, Wayne Burton, and were *not* independent fraud, deceit, misrepresentation or conversion of trust funds of the investment counselors, separate from the fraud, deceit, misrepresentation and conversion of trust funds by the broker — Wayne Burton. Only a single Broker's license was necessary (i.e., Burton could himself lawfully have done all acts done by the investment counselors); his use of licensed agents to transmit authorized information between the broker and his client investors does not increase the single $100,000 limit on the liability of the Recovery Account under section 10474 of the Business and Professions Code, even though the invest-

---

license was required, the aggrieved person may, upon the judgment becoming final, file an application with the Department of Real Estate for payment from the Recovery Account, within the limitations specified in Section 10474, of the amount unpaid on the judgment which represents an actual and direct loss to the claimant in the transaction."

[4] Section 10474, subdivision (c) provides: "Notwithstanding any other provision of this chapter and regardless of the number of persons aggrieved or parcels of real estate involved in a transaction or the number of judgments against a licensee, the liability of the Recovery Account shall not exceed the following amounts:

"(c) For causes of action which occurred on or after January 1, 1980, twenty thousand dollars ($20,000) for any one transaction and one hundred thousand dollars ($100,000) for any one licensee."

[5] "Augustyn purchased two promissory notes from Kai I. Gulve, a real estate licensee acting as investment counselor in Burton's organization. Augustyn has secured a judgment against Gulve for losses, but has not sued Burton. Gulve has filed bankruptcy. Unable to recover all of his judgment from Gulve, Augustyn has also sought recovery against the Gulve recovery account fund, but has not applied for any recovery from the Burton recovery fund." (*Augustyn v. Superior Court, supra,* 186 Cal.App.3d at p. 1224.)

[6] Section 10474.5 provides: "If the amount of liability of the Recovery Account as provided for in Section 10474 is insufficient to pay in full the valid claims of all aggrieved persons by whom claims have been filed against any one licensee, the amount shall be distributed among them in the ratio that their respective claims bear to the aggregate of the valid claims, or in any other manner as the court deems equitable. Distribution of any moneys shall be among the persons entitled to share therein, without regard to the order of priority in which their respective judgments may have been obtained or their claims have been filed. Upon petition of the commissioner, the court may require all claimants and prospective claimants against one licensee to be joined in one action, to the end that the respective rights of all claimants to the Recovery Account may be equitably adjudicated and settled."

ment counselors are civilly liable to the investors for negligent misrepresentation or breach of their fiduciary duties as licensed sub-agents."

GOVERNING LAW

Section 10470 et seq., establishes a special fund supported by license fees designed to compensate victims defrauded by real estate licensees. Section 10471, subdivision (a) provides for recovery from the Fund of unpaid judgments against the licensee for "fraud, misrepresentation, deceit, or conversion of trust funds arising directly out of any transaction in which the defendant . . . [was] licensed . . . [and] performed acts for which that license was required . . ." (See *Deas* v. *Knapp* (1981) 29 Cal.3d 69, 73 [171 Cal.Rptr. 823, 623 P.2d 775]; *Vinci* v. *Edmonds* (1986) 185 Cal.App.3d 1251, 1254 [230 Cal.Rptr. 308].) ■ Recovery is available also to those judgment creditors whose claims are based upon negligent misrepresentation (*Andrepont* v. *Meeker* (1984) 158 Cal.App.3d 878, 884-886 [204 Cal.Rptr. 887]), regardless of whether the judgment debtor is a licensed real estate broker or a licensed real estate sales person (*Vinci* v. *Edmonds, supra,* 185 Cal.App.3d at p. 1254; *Merrifield* v. *Edmonds* (1983) 146 Cal.App.3d 336, 340-341 [194 Cal.Rptr. 104]).

■ Section 10471 is remedial in character, intended to protect the public against loss arising from misrepresentations and breaches of fiduciary duty by licensed real estate personnel who are unable to respond to damage awards. (*Vinci* v. *Edmonds, supra,* 185 Cal.App.3d at p. 1256; *Booth* v. *Robinson* (1983) 147 Cal.App.3d 371, 378 [195 Cal.Rptr. 130]; *Nordahl* v. *Department of Real Estate* (1975) 48 Cal.App.3d 657, 663 [121 Cal.Rptr. 794].) Consequently, it is accorded a liberal construction promoting its purpose in protecting those persons within its purview, by granting relief unless to do so is clearly forbidden by the statutory scheme. (*Vinci* v. *Edmonds, supra,* 185 Cal.App.3d at p. 1256; *Andrepont* v. *Meeker, supra,* 158 Cal.App.3d at p. 884; *Booth* v. *Robinson, supra,* 147 Cal.App.3d at p. 378.) In other words, " '[[s]ection 10471] will be construed when its meaning is doubtful so as to suppress the mischief at which it is directed, to advance or extend the remedy provided, and to bring within the scope of the law every case which comes clearly within its spirit and policy. [Citations.]' " (*Vinci* v. *Edmonds, supra,* 185 Cal.App.3d at p. 1256, quoting *Booth* v. *Robinson, supra,* 147 Cal.App.3d at p. 378.)

■ The underlying purposes of the statutory scheme are twofold. First, the primary purpose of the entire act of which this statutory scheme is a part "is to raise the standards of the real estate profession by requiring its

members to deal fairly and ethically *with their clients.*" (*Middelsteadt* v. *Karpe* (1975) 52 Cal.App.3d 297, 302 [124 Cal.Rptr. 840]; *Andrepont* v. *Meeker, supra,* 158 Cal.App.3d at p. 884; *Merrifield* v. *Edmonds, supra,* 146 Cal.App.3d at p. 344.) Secondly, the specific "purpose of section 10471 is to compensate innocent members of the public who are victimized by dishonest licensees." (*Merrifield* v. *Edmonds, supra,* 146 Cal.App.3d at p. 344.) Consequently, the legislation is designed not only to protect consumers, but also to encourage the real estate profession to pursue higher standards. (*Andrepont* v. *Meeker, supra,* 158 Cal.App.3d at p. 884.)

### The Trial Court Erred in Concluding There Was No Independent Misrepresentation by the Investment Counselors

██ Augustyn first contends the trial court unjustifiably characterized *the activities of the investment counselors as "passing information and documents between the broker Burton and investors",* giving rise to no "*independent fraud, deceit, misrepresentation or conversion of trust funds of the investment counselors, separate from the fraud, deceit, misrepresentation and conversion of trust funds by the broker. . . ."* We agree.

The stipulated facts establish Burton defrauded investors while acting under his broker's license by soliciting investments to be secured by real property (§§ 10130, 10131, subds. (d), (e)) or by issuing his own note to be later secured by real estate (§ 10131.1). He further employed "investment counselors", many of whom were unlicensed, to solicit, negotiate and otherwise deal directly with the investors on his behalf and as his subagents. They provided information furnished by the home office, filled out forms, accepted money, delivered standard documents and forwarded trust deeds from the home office. In order to perform these activities as Burton's agent, a real estate license was required. ██ ██ █, ██ Indeed, a real estate salesperson "is a natural person who, for a compensation or an expectation of a compensation, is employed by a licensed real estate broker to do one or more of the acts set forth in Sections 10131, 10131.1, 10131.2, 10131.3 and 10131.6." (§ 10132.)[7]

We recognized in *Montoya* v. *McLeod, supra,* 176 Cal.App.3d at pages 62-63, the independent responsibilities of a licensed salesperson employed

---

[7] "A real estate salesperson cannot contract in his or her own name or accept compensation except from the broker under whom he or she is licensed. [Citations.]" (*Merrifield* v. *Edmonds, supra,* 146 Cal.App.3d at p. 342-343.)

by a broker involved in the same Universal Financial/Burton scheme. We explained that McLeod's role was best seen as that of a licensed real estate salesperson employed by Burton, a licensed real estate broker, to solicit lenders and negotiate ostensibly secured loans. Her duties thus fell squarely under section 10131, subdivision (d) and, as such, could only be undertaken by a licensed broker or licensed salesperson employed by a broker. (§§ 10130, 10131, 10132.) We noted that even if she simply *solicited* lenders to make loans secured by real property, she should have been licensed. (§ 10131, subd. (d).) However, as an "investment counselor", she did much more by communicating the terms and conditions of investments with Universal Financial to would-be lenders, accepting and rejecting offers, transmitting counter-offers, personally paying finder's fees, and, most importantly, executing the promissory notes underlying the various transactions. We explained further: "That McLeod's responsibility should be narrow because her discretionary authority in these transactions was less than absolute is an untenable proposition. Indeed, the real estate law *requires* a broker to supervise and control the activities of a licensed salesman. [Citation.] Thus, the nature of McLeod's employment does not preclude her responsibilities and duties as a licensed real estate salesperson, but, in fact, *requires* she exercise precisely those duties." (*Montoya, supra,* 176 Cal.App.3d at p. 63.) We thus rejected her assertion the fiduciary relationship with her clients was solely between them and her principal, Burton, not her, holding such a determination — "would allow brokers to partition their duties so completely that no individual employee would need to be licensed nor undertake the California common and statutory law duties for real estate brokers. This would subvert the real estate law's purpose to upgrade the standards of the real estate profession and to provide protections to the consuming public. [Citations.]" (*Id.* at pp. 63-64.)[8]

---

[8] We further examined McLeod's conduct of her duties and responsibilities, declaring: " 'The law imposes on a real estate agent "the same obligation of undivided service and loyalty that it imposes on a trustee in favor of his beneficiary." [Citations.]' [Citation.] In particular, 'a real estate licensee is "charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision. [Citations.]" ' [Citations.] This agency is fiduciary in nature and imposes high standards of good faith. [Citations.] Additionally, an agent is under a duty to use reasonable care, but as a professional must use a higher degree of skill and diligence in the conduct of his duties. [Citations.] Finally, a real estate agents' ignorance of these duties does not excuse their malfeasance. [Citation.] [¶] Here, McLeod never informed the Montoyas that Burton was himself the borrower and her giving them an unsecured note in exchange for their investment was prohibited by law. [Citation.] That McLeod was ignorant of Burton's status as borrower does not excuse her failure to make reasonable inquiry. By her own admission, she undertook more than 100 similar transactions without inquiring as to the legitimacy of potential borrowers of her clients' monies. This conduct is outrageous and, in the present case, breaches her fiduciary duty to the Montoyas. Similarly, her violation of section 10231, while affording no private right of action, further evidences McLeod's disregard of the law and her professional duties. In this transaction, McLeod profited, by her eventual commission, from a breach of her fiduciary

The Commissioner correctly points out that we are bound on this appeal by the stipulated facts, not by the facts set forth within the above lengthy passages from *Montoya* v. *McLeod, supra,* 176 Cal.App.3d 57. However, our characterization of the independent fiduciary responsibilities of the licensed investment counselors is equally applicable here, as it is undisputed Universal Financial and Burton employed some licensed investment counselors to solicit, negotiate and otherwise directly deal with the investors in matters requiring a real estate license.

Consequently, based on the foregoing and mindful the Legislature intended the Fund to compensate victims of negligent misrepresentations or breaches of fiduciary duty (*Andrepont* v. *Meeker, supra,* 158 Cal.App.3d at p. 885), the trial court erred in concluding the negligent misrepresentations and breaches of fiduciary duty by licensed investment counselors employed by Burton and Universal Financial did not constitute their independent fraud and misrepresentation. To the contrary, the magnitude and dimensions of this orchestrated fraudulent scheme was predicated upon the independent negligence and breaches of fiduciary duty of the licensed investment counselors. In other words, the success of this fraudulent scheme was rooted in the investors' trust in the licensed investment counselors' integrity, conscientiousness and expertise regarding real estate investment.

THE TRIAL COURT ERRED IN CONCLUDING AUGUSTYN MUST SHARE IN BURTON'S $100,000 RECOVERY FUND WITH ALL OTHER APPLICANTS WHOSE CLAIMS ARE BASED UPON BURTON'S FRAUD AS A BROKER AND THE NEGLIGENT MISREPRESENTATIONS/BREACHES OF FIDUCIARY DUTY BY LICENSED INVESTMENT COUNSELORS

Reasoning that because only a single broker's license was legally necessary for Burton to have performed all the acts done by the investment counselors, the trial court concluded Burton's use of licensed agents to transmit authorized information between him and interested investors does not increase the single $100,000 limit on the liability of the recovery account under section 10474, even though investment counselors are civilly liable to the investors for negligent misrepresentation or breach of their fiduciary duties as licensed subagents. Relying on *Deas* v. *Knapp, supra,* 29 Cal.3d 69, and *Fox* v. *Prime Ventures, Ltd.* (1978) 86 Cal.App.3d 333 [150 Cal.Rptr. 202], the Commissioner seeks ratification of the trial court's determination. The Commissioner's reliance on *Deas* and *Fox* is misplaced.

---

duty to the Montoyas. On these facts, she is, at least, liable for their damage on a constructive fraud theory. [Citations.]" *Montoya* v. *McLeod, supra,* 176 Cal.App.3d at pp. 64-65.)

In *Fox* v. *Prime Ventures, Ltd., supra,* 86 Cal.App.3d at pages 335-337, the court determined that the limit on liability of the recovery Fund under the circumstances was that of one license, rather than two, where both judgment debtors, a corporation and its designated officer, were licensed real estate brokers. There, the aggregate amount of the outstanding judgments against the two licenses far exceeded any amounts payable by the Fund pursuant to the Act. In concluding the limit for only one license was applicable, the court reasoned: "Section 10471 defines the acts for which the Fund will protect the creditor and limits the amount payable to any one judgment creditor. The section contemplates that the fraud will arise from the acts of the licensee in a real estate transaction, and that no more than $10,000 will be recovered for a single transaction. The fact that two or more licenses are involved in a single transaction does not produce a greater than $10,000 recovery. The Commissioner argues that there was only a single act from which liability arose, the act of entrusting funds. This is correct. The funds were entrusted to Sather Gate, which could only act through its qualified officers, in this case through Heneveld. The fact that its qualified officer held his own license was a mere irrelevancy: Heneveld did nothing in his individual capacity he could not have done without a license. Here in each act of entrustment and misappropriation, there was still a single real estate transaction, a single license performing acts requiring a license and, therefore, it is concluded, a single license within the meaning of section 10474.

"The limitation of section 10474 is in addition to the transactional limitation of section 10471, and cannot enhance a recovery already limited by section 10471. If one transaction involved one license, two licenses or more, there can be but $10,000 recovery because of section 10471. In order to give complete effect to the transaction limit of section 10471, the 'transaction' limitation must be read into section 10474. Since the additional license did not add another 'transaction,' it should not double the $20,000 limit of section 10474, subdivision (a)." (*Id.* at p. 336.)

Consequently, the *Fox* court's decision rested on the irrelevancy of Heneveld's license and the fact his conduct required no license at all. In fact, it was simply by chance the respondents there were defrauded by a corporation whose designated officer was individually licensed, causing the court to declare: "The victims lost no more by the additional license." (*Id.* at p. 337.)

Similarly, in *Deas* v. *Knapp, supra,* 29 Cal.3d at page 75, the Supreme Court held that the single license limitation was applicable, explaining: " 'It is true that Knapp had three licenses, the first issued to him in 1949, when

he was doing business as Investors Exchange; the second in 1967 under the name Mission Mortgage and Loan; and the third in 1969, as Mutual Mortgage and Loan. Plaintiffs' judgment, however, was solely against Knapp individually, based upon allegations in their complaint that he was doing business with them as Investors Exchange. The fact that Knapp had other licenses is fortuitous, and in no way affected the plaintiffs. This aspect of the case is governed by *Fox* v. *Prime Ventures, Ltd.* (1978) 86 Cal.App.3d 333, 334-337, holding that where the transaction giving rise to the judgment arose out of acts for which only one license was required, recovery is limited by the amount stipulated in the statute "for any one licensee." ' "

Consequently, these decisions caused us to declare in the earlier mandate petition here that "[e]ach decision holds that on its facts only one recovery against the Fund was proper, despite the fortuitous circumstance that more than one licensee participated in defrauding the buyer." (*Augustyn* v. *Superior Court, supra,* 186 Cal.App.3d at p. 1225.) However, the holdings of *Fox* and *Deas* are inapplicable here where it is not simply fortuitous that more than one license is involved in the transaction, because separate licensees participated in individual conduct which victimized the judgment creditors.

Mindful of the remedial character of section 10471 and its intent to protect the public from losses resulting from misrepresentation and breach of fiduciary duty by licensed real estate personnel who are unable to respond to damage awards, as well as our obligation to liberally construe it to promote its purpose and protect the individuals within its purview, we conclude the statutory scheme does not preclude a judgment debtor from electing which licensee to recover against where multiple licensees are involved. Here, Augustyn elected to pursue his licensed real estate salesperson, Gulve, not Burton. In fact, he has neither obtained a judgment against Burton, nor made any claim against Burton's recovery fund. Rather, he sought recovery from Gulve and her individual recovery fund. ■ Consequently, where multiple licensed real estate personnel are involved in a transaction performing acts requiring a license (and thus the existence of multiple licenses is not fortuitous) and individual conduct of each results in a judgment on a ground stated in section 10471, the victim may seek recovery from the recovery fund[9] of any licensed judgment debtor.

---

[9] The transactional relationship requirement of section 10471, subdivision (a) and applicable monetary limitation here pursuant to section 10474, subdivision (c) are not inconsistent with our holding here. Neither precludes recognition of the potential of multiple-licensee wrongful or negligent conduct involving acts requiring a license within the flexible and broad meaning of "transaction" (see *Dombalian* v. *Fox* (1979) 88 Cal.App.3d 763, 765-767 [152 Cal.Rptr. 86]), giving rise to recovery under the Act from either licensee's individual fund.

## DISPOSITION[10]

Judgment reversed.

Wiener, Acting P. J., and Butler, J., concurred.

A petition for a rehearing was denied August 12, 1987, and respondent's petition for review by the Supreme Court was denied October 22, 1987. Mosk, J., and Panelli, J., were of the opinion that the petition should be granted.

---

[10] In light of our disposition, we do not address Augustyn's contention the petition for proration was flawed in that the declaratory relief judgment appealed from preceded any formal application on a judgment against Burton.